### DISTRICT OF COLUMBIA, et al., Appellants,

### v.

### AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al., Appellees.

### DISTRICT OF COLUMBIA BOARD OF EDUCATION, et al., Appellants,

### v.

### AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, et al., Appellees.

### Nos. 92–CV–1275, 92–CV–1276.

District of Columbia Court of Appeals.

Argued Dec. 10, 1992.

Decided Jan. 15, 1993.

---

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellants.

Anne M. Wagner, with whom Mark D. Roth, Robert Paul, Wendy Kahn, Edward J. Smith, Patrick J. Szymanski, Jonathan G. Axelrod, Sally M. Tedrow, Carol R. Golubock, William B. Peer, and Barbara L. Camens, Washington, DC, were on the brief, for appellees.

Before FERREN, TERRY and SCHWELB, Associate Judges.

FERREN, Associate Judge:

On October 22, 1992, at the behest of several government employees' unions,[1] the trial court preliminarily enjoined the District of Columbia from furloughing employees covered by certain collective bargaining agreements and from eliminating their within-grade pay increases and their accrual of time in grade for purposes of future increases, as otherwise required by the District of Columbia Appropriations Act, 1993, Pub.L. No. 102–382, Title I, 106 Stat. 1422 (1992) (1993 Appropriations Act). The trial court also denied the District appellants'[2] motion to dismiss the unions'

1. American Federation of Government Employees, AFL–CIO, Locals 383, 631, 727, 872, 1000, 1975, 2553, 2725, 2737, 2741, 2978, 3406, 3444, 3721, and 3871; American Federation of State, County and Municipal Employees, AFL–CIO, Council 20 and its Locals 709, 877, 1200, 1808, 2087, 2091, 2092, 2095, 2096, 2401, 2743, 2776, and 3758; National Association of Government Employees, AFL–CIO, Local R3–05; International Brotherhood of Police Officers, AFL–CIO, Local 445; Communications Workers of America, AFL–CIO, Local 2336; International Brotherhood of Teamsters, AFL–CIO, Local 1714; Washington Area Metal Trades Council, AFL–CIO; Service Employees International Union, AFL–CIO, Local 1199E–DC; and Jocelynn C. Johnson are Appellees in No. 92–CV–1275.

American Federation of State, County and Municipal Employees, AFL–CIO, Council 20, and its Locals 2921 and 1959; Washington Teachers Union, Local 6; Teamsters Locals 639 and 730; and Clara B. Webb, Lillian Herrion, Mary Collins, Sam White, and Larry Hawkins are Appellees in No. 92–CV–1276.

2. The District of Columbia and Sharon Pratt Kelly in her capacity as Mayor are Appellants in No. 92–CV–1275.

complaints. The District and the School Board contend on appeal that the trial court erred in ruling, as the basis for its injunction, that the 1993 Appropriations Act violates the Contract Clause, Article I, Section 10, of the United States Constitution. They argue, more specifically, that the Appropriations Act is an act of Congress and that the Contract Clause does not apply to congressional action. Appellants also contend, in response to the unions' alternative argument, that the Appropriations Act does not violate due process. We agree with the District and the School Board; there are no Contract Clause or due process violations. We reverse and remand.

### I.

The District and School Board defendants-appellants, *see supra* note 2, and the union plaintiffs-appellees, *see supra* note 1, are parties to collective bargaining agreements authorized by statute. *See* D.C.Code §§ 1–618.16, –618.17 (1992 Repl.). The District's Fiscal Year 1993 Budget Request Act, D.C. Act 9–186, 39 D.C.Reg. 2674 (1992), effective April 7, 1992, provided for twelve furlough days for each full-time District employee (excluding court employees) during the fiscal year. That Act also froze within-grade increases and eliminated the accrual of time in grade for purposes of future increases. On May 26, 1992, the employee unions in 92–CV–1275 filed an action for declaratory and injunctive relief, claiming that the 1993 Budget Request Act impaired their collective bargaining agreements in violation of the Contract Clause, which applies through D.C.Code § 1–204 (1992 Repl.) to the District's exercise of "legislative power."

Thereafter, the Mayor submitted the District's 1993 Budget Request Act to the President for transmission to Congress, pursuant to D.C.Code § 47–304 (1990 Repl.), which empowers Congress—not the District—to appropriate all funds for the District. While the legislation based on the 1993 Budget Request Act was pending in Congress, the District moved to stay the proceedings in 92–CV1275 on the ground that congressional action would moot the unions' claims against the District. On September 4, 1992, the trial court granted a stay until October 6. The unions did not attempt to appeal this order. *See infra* note 9.

On September 17, 1992, the school employees' unions in 92–CV–1276 filed a Superior Court complaint similar to the one in 92–CV–1275, claiming in addition that the 1993 Budget Request Act interfered with the authority granted to the Board of Education by D.C.Code § 31–104 (1988 Repl.). On October 5, 1992, President Bush signed the 1993 Appropriations Act, preserving unchanged the provisions regarding furloughs, within-grade increases, and time in grade submitted in the District's 1993 Budget Request Act. Soon thereafter, the unions in both cases filed motions for a preliminary injunction. On October 13, the trial court consolidated the actions. Three days later, the District and the School Board moved to dismiss the actions as moot. On October 20, the trial judge held a hearing on the motions. Two days later, the judge granted the motions for preliminary injunction and denied the motion to dismiss. The same day this court stayed the preliminary injunctions pending final determination of these consolidated appeals.

### II.

Although these appeals concern the grant of preliminary injunctions, this court may reach the merits of the cases.

Ordinarily appellate review of the grant or denial of injunctive relief is focused on an evaluation of whether the trial court abused its discretion. *Stamenich v. Markovic*, 462 A.2d 452, 456 (D.C.1983). Where, however, the trial court's action

---

The District of Columbia Board of Education; David Hall, Nate Bush, Rev. David H. Eaton, Karen Shook, Jay Silberman, Wilma R. Harvey, Erika Landberg, Sandra Butler–Truesdale, Angie K. Corley, Iris J. Toyer, Linda Moody, and

Dr. Franklin E. Smith, in their individual and/or official capacities as members of the District of Columbia School Board; the District of Columbia; and Mayor Sharon Pratt Kelly are Appellants in No. 92–CV–1276.

"turns on a question of law or statutory interpretation, we may reach the merits of the controversy." *Don't Tear It Down, Inc. v. District of Columbia,* 395 A.2d 388, 391 (D.C.1978) (citations omitted); *District of Columbia Unemployment Compensation Board v. Security Storage Co. of Washington,* 365 A.2d 785, 787 (D.C.1976), *cert. denied,* 431 U.S. 939, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977). Since this appeal involves a constitutional challenge ..., we elect to review this case on the merits of the controversy.

*Turner v. Fraternal Order of Police,* 500 A.2d 1005, 1007 (D.C.1985) (parallel citations omitted). Accordingly, because these appeals present a constitutional question, we shall review the merits of the controversy.

### III.

### A.

The trial judge proceeded on the premise that an appropriations act for the District of Columbia is exclusively an act of Congress—a proposition with which we agree. *See infra* Part IV. B. Based on that premise, then, the first question is whether Congress, in adopting the 1993 Appropriations Act for the District, effectively transmuted itself into a state legislature, subject to whatever constraints, constitutional or otherwise, apply to the states when they enact such legislation. The judge answered yes. Quoting *Brown v. United States,* 239 U.S.App.D.C. 345, 349, 742 F.2d 1498, 1502 (1984) (en banc), *cert. denied,* 471 U.S. 1073, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985), he concluded that whenever Congress " 'act[s] as the local legislature for the District of Columbia, ... enact[ing] legislation applicable only to the District and tailored to meet local needs,' " it is "acting as a State legislative body." Seeing the 1993 Appropriations Act as an example of such congressional action, the trial judge relied further on *Brown* to the effect that, " '[a]bsent evidence of contrary congressional intent, such enactments should be treated as local law, interacting with federal law as would the laws of the several states.' " *Id.*

On that basis, the judge concluded that the Contract Clause of the United States Constitution (Art. I, § 10)—"[n]o State shall ... pass any ... Law impairing the Obligation of Contracts"—applied to congressional enactment of the furlough, within-grade increase, and time in grade provisions in the 1993 Appropriations Act.

■ *Brown,* however, did not deal with the Contract Clause. The trial judge also failed to observe that *Brown,* as a 1984 decision, is not binding on this court. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971) (court of appeals "not bound by the decisions of the United States Court of Appeals rendered after" February 1, 1971). In contrast, *John McShain, Inc. v. District of Columbia,* 92 U.S.App.D.C. 358, 205 F.2d 882, *cert. denied,* 346 U.S. 900, 74 S.Ct. 227, 98 L.Ed. 400 (1953), which the trial court rejected as wrongly decided, not only directly concerned the Contract Clause but also, as a pre–1971 case, is binding on us under *M.A.P.,* 285 A.2d at 312. In *McShain,* the United States Court of Appeals for the District of Columbia Circuit held that a statute enacted by Congress as a local law for the District—the District of Columbia Revenue Act of 1949—did not violate the Contract Clause precisely because that constitutional provision "is a limitation on state rather than federal action." 92 U.S.App.D.C. at 359, 205 F.2d at 883. An even earlier case that is also binding on us, *District of Columbia v. Capital Traction Co.,* 41 App.D.C. 115 (1913), similarly sustained an act of Congress regulating streetcars in the District against a Contract Clause claim. The federal circuit court held that "the prohibition of laws impairing the obligations of contracts applies to the States, and not to the United States." *Id.* at 119. In short, the Contract Clause, applicable only to the fifty states, does not impose a limitation on congressional legislation for the District.

While an intervening Supreme Court decision could have altered the effect of these federal circuit court precedents, *see, e.g., Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992), no Supreme Court decision has done so. The trial judge erred in rely-

ing on *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), for that purpose. *Palmore* presented the question whether a criminal defendant charged with a felony under the District of Columbia Code could "be tried by a judge who does not have protection with respect to tenure and salary under Art. III of the Constitution." 411 U.S. at 390, 93 S.Ct. at 1672. The Supreme Court answered yes, holding that Congress, in exercising its "plenary" power to legislate for the District under Article I, Section 8, Clause 17 of the Constitution, has authority to provide for criminal trials by judges in a local court system (created under Article I) that does not meet Article III requirements. The Court did say in *Palmore* that, in legislating for the District, "Congress may ... exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Id.* at 397, 93 S.Ct. at 1676. But the Court was referring only to the expansive scope of congression-

al power over the District, not to limitations on that power.

> It is apparent that the power of Congress under [Article I, Section 8,] Clause 17 permits it to legislate for the District in a manner with respect to subjects that would *exceed* its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Art. I, § 8.

*Id.* at 397–98, 93 S.Ct. at 1676 (emphasis added) (citing *Gibbons v. District of Columbia*, 116 U.S. 404, 408, 6 S.Ct. 427, 429, 29 L.Ed. 680 (1886)).[3]

The Court in *Palmore* also confirmed that whenever Congress exercises for the District the " 'legislative powers that the legislature of a State might exercise within the State,' " Congress may " 'not contravene any provision of the Constitution of the United States.' " *Id.* 411 U.S. at 397, 93 S.Ct. at 1676 (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899)).[4] This statement, how-

---

**3.** *Gibbons* addressed the potential conflict between Article I, Section 8, Clause 17 of the Constitution, granting Congress plenary authority to legislate for the District, and Article I, Section 9, Clause 4 (modified by the Sixteenth Amendment in 1913), prohibiting Congress from laying any "Capitation, or other direct, Tax ..., unless in Proportion to the Census, or Enumeration herein before directed to be taken." A District property owner challenged the validity of real estate taxes for the support of the District government, imposed by Congress under its power to legislate for the District. The owner claimed that a taxation scheme with different rates for different classes of property violated the Constitution's requirement that all direct taxes imposed by Congress be proportional to the census. Reviewing its earlier caselaw, the Supreme Court concluded that Congress possesses the power when "legislating as a local legislature for the District, to levy taxes for District purposes only, in like manner as the legislature of a State may tax the people of a State for State purposes." 116 U.S. at 407, 6 S.Ct. at 429. The Court concluded that when Congress levied taxes on the District, its plenary power to legislate for the District supplanted the constitutional limitation, now mooted by the Sixteenth Amendment, on the kinds of taxes Congress could lay on the nation as a whole. "In the exercise of this power [to levy taxes for District purposes only], Congress, like any State legislature unrestricted by constitutional provisions, may at its discretion wholly exempt certain classes of property from taxation, or may

tax them at a lower rate than other property." *Id.* at 408, 6 S.Ct. at 426.

The constitutional restriction at issue in *Gibbons* limiting the kinds of taxes Congress could lay on the nation as a whole (before the Sixteenth Amendment) interacts with Congress's constitutional authority to legislate for the District in a way altogether different from—indeed, contrary to—the way the Contract Clause interacts with Congress's power over the District. The direct tax limitation restricted Congress's power to do something that states are free to do, whereas the Contract Clause precludes states from doing something Congress is entitled to do (subject to due process limitations). Thus, the Supreme Court concluded in *Gibbons* that the constitutional provision granting Congress plenary legislative power over the District provided Congress with *additional* power (to tax the District in ways it could not tax the nation as a whole). *Gibbons* does not provide support for the altogether different proposition advanced by the employee unions here: that the constitutional provision granting Congress plenary authority over the District also *limits* Congress's power when it acts solely as a local legislature—for example, by subjecting such legislation to the Contract Clause.

**4.** Like *Gibbons, Hof* concerned a potential conflict between the constitutional provision granting Congress plenary authority to legislate for the District and another constitutional provision limiting the power of Congress but not of the

ever, cannot legitimately be construed to mean that Congress is limited by the Contract Clause—which applies only to the fifty "states"[5]—when Congress enacts a local law for the District. In context, the Court was referring only to constitutional limitations applicable to the Congress acting as Congress. Neither *Palmore* nor any of the cases cited there supports the proposition, announced by the trial judge here, that a constitutional limitation on the states imposes a limitation on Congress when it acts as a legislature for the District. In addition to *Gibbons, supra* note 3, and *Hof, supra* note 4, *Palmore* cites five precedents for the Supreme Court's "characteristic view ... of congressional powers with respect to the District." 411 U.S. at 397 & n. 7, 93 S.Ct. at 1676 & n. 7. All cited cases affirm the expansiveness of Congress's power to legislate for the District; none mentions any constitutional limitation on that power derived from constitutional limitations on actions by states.[6]

In sum, nothing in the language of the Constitution, and no Supreme Court decision cited to us,[7] indicates that, when Con-

states. In *Hof*, the Supreme Court considered the effect of the Seventh Amendment right to a jury trial on "the validity ... of the legislation of Congress conferring upon justices of the peace in the District of Columbia jurisdiction in civil actions in which the matter in dispute exceeds $20 in value, and providing for a trial by a jury before the justice of the peace, an appeal from his judgment to the Supreme Court of the District of Columbia, and a trial by jury, at the request of either party, in the appellate court." 174 U.S. at 4, 19 S.Ct. at 582. Unlike *Gibbons*, however, *Hof* did not need to invoke a distinction between Congress's respective powers in legislating for the District and in legislating for the nation as a whole. The Supreme Court held that in either capacity, Congress may "not contravene any provision of the Constitution of the United States," *id* at 5, 19 S.Ct. at 582, including the Seventh Amendment. *Hof* upheld the congressional scheme expanding the jurisdiction of the District's justices of the peace on the ground that those justices did not sit as courts within the meaning of the Seventh Amendment, *id.* at 38–39, 19 S.Ct. at 594–595, and that the jury trial right was preserved through the right to a jury trial in the appellate court. Consequently, no real conflict arose between the Seventh Amendment and what Congress had done when legislating for the District.

5. In *Metropolitan Railroad Co. v. District of Columbia*, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889), a suit by the District for breach of contract, the Supreme Court said that "the District of Columbia is a separate political community in a certain sense, and in that sense may be called a State; but the sovereign power of this qualified State is not lodged in the corporation of the District of Columbia, but in the government of the United States." *Id.* at 9, 10 S.Ct. at 22. The Supreme Court concluded that "whilst the District may, in a sense, be called a State, it is such in a very qualified sense." *Id.*

6. *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), held that although Congress had the power to permit all federal circuit courts to issue writs of mandamus to federal officials, it had not done so,

whereas Congress had intended to allow the circuit court for the District of Columbia to issue such writs, an action Congress had taken while exercising its power to legislate for the District. *Mattingly v. District of Columbia,* 97 U.S. (7 Otto) 687, 24 L.Ed. 1098 (1878), concerned a claim that the local District government, in making assessments for local improvements, had acted beyond the authority delegated to it by Congress. The Supreme Court held that Congress, by acting under its plenary power to legislate for the District, ratified and thus cured any such defect in the action by the local body. *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), concerned a claim that the federal government had exceeded its power of eminent domain over the land that became Rock Creek Park. The Supreme Court held that if the federal power of eminent domain, when exercised within a state, was restricted to the purposes enumerated in the Constitution, no such objection applied in the District of Columbia because of Congress's power to legislate "in all cases whatsoever" concerning the District. *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932), held that Section 1 of the Sherman Antitrust Act limited Congress to its power under the Commerce Clause, but that under Section 3, Congress could also exercise its power to legislate for the District. The Court invoked the language of *Hof* prohibiting Congress from infringing other constitutional limitations in the process. *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), held that the courts of the District of Columbia, as constituted at the time, were limited by Article III of the Constitution, a provision that does not apply to the states.

7. In addition to *Palmore* and the decisions on which it relies, the parties cited *Metropolitan Railroad Co., supra* note 5, and three other Supreme Court cases that address Congress's authority over the District of Columbia. In *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), holding that "Art. III bars Congress

gress exercises plenary authority over the District of Columbia in the role of a local legislature, Congress itself is subject to constitutional limitations on state legislatures.[8] The Supreme Court caselaw goes only far enough to suggest that Congress, when acting as a local legislature for the District, (1) may have greater powers than Congress can exercise over the nation as a whole, *see Gibbons, supra,* note 3, but (2) may not contravene constitutional limitations applicable to Congress acting as Congress, *see Hof, supra* note 4. Any argument that Congress, acting as the District's local legislature, is also subject to constitutional limitations on the states, such as the Contract Clause, is therefore premised on the authority of analogy alone. Such a decision would be unprecedented; we have no authority to impose such a limitation on congressional power. Accordingly, if there is to be any Contract Clause-type limitation on Congress in the exercise of its plenary power over the District, that limitation would have to be self-imposed through legislation. Congress is not subject to the Contract Clause, as such, when Congress legislates for the District. *See McShain; Capital Traction.*

## B.

■ The trial judge also concluded, however, in the alternative, that Congress has imposed a Contract Clause-type limitation on itself. He ruled that congressional legislation after *McShain*—the District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973) (codified in scattered sections of the D.C.Code) ("Self–Government Act")—effectively overruled *McShain.* We disagree. It is true that, through the Self–Government Act, Congress delegated to local officials much of its constitutional authority to legislate for the District under Article I, Section 8, Clause 17 of the Constitution. But there is nothing in either the text or the legislative history of the Self–

from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws," the Supreme Court distinguished "from the other broad powers conferred on Congress" by the Constitution, its even broader power over the District of Columbia, which "encompasses the *full* authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative." *Id.* at 76, 102 S.Ct. at 2874 (citing *Palmore* ). While determining the scope of its appellate jurisdiction in *Key v. Doyle,* 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977), the Supreme Court cited *Palmore* for the proposition that "[a]lthough Congress had [by statute] expressly classified the District of Columbia Court of Appeals as a state court, it had not indicated that D.C.Code provisions should be treated as state statutes." *Id.* at 64, 98 S.Ct. at 283. In *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), deciding the status of laws against racial discrimination passed by the District government in the nineteenth century, the Supreme Court found "no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted." *Id.* at 109, 73 S.Ct. at 1012.

**8.** Although not cited in *Palmore,* at least one other Supreme Court case has addressed the respective limitations on congressional legislation for the nation and for the District. In deciding *Gibbons, supra* note 3, the Supreme Court relied on *Loughborough v. Blake,* 18 U.S. (5 Wheat.) 317, 5 L.Ed. 98 (1820). *Loughborough* held that Congress had a right to impose on the District the same direct tax that it imposed on the states, even though the District did not have a representative in Congress. In so ruling, however, Chief Justice John Marshall explicitly declined to rest the Court's opinion on a distinction between the "character" of Congress in "legislating for the States" and in acting "as a local legislature for the [D]istrict." *Id.* at 318. Nonetheless, in dicta, he used language suggesting the approach later taken in *Gibbons:* "[T]hose articles [of the Constitution] which, in general terms, restrain the power of Congress, may be applied to the laws enacted by that body for the [D]istrict [of Columbia], if it be considered as governing the [D]istrict in its character as the national legislature, with less difficulty than if it be considered a mere local legislature." *Id.* In other words, the Constitution imposes greater restraint on Congress when acting for the District as part of the nation as a whole—*i.e.,* when Congress acts as a national legislature—than when Congress acts merely as a local legislature for the District. Nothing in *Loughborough* or in *Gibbons, see supra* note 3, or *Hof, see supra* note 4—all of which confirmed the expansiveness of congressional authority over the District—mentioned any limitation on congressional power other than constitutional limitations applicable to Congress *as Congress,* whether acting for the District or for the nation.

Government Act to suggest that Congress thereby bound itself to the Contract Clause. *See* HOUSE COMM. ON D.C., 93d Cong., 2d Sess., HOME RULE FOR THE DISTRICT OF COLUMBIA, 1973–74: BACKGROUND AND LEGISLATIVE HISTORY OF ... THE DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT (1974). To the contrary, as elaborated below in Part IV. A., Congress has expressly recognized in the Self–Government Act its authority to exempt legislation for the District from any Contract Clause limitation. *See* D.C.Code §§ 1–204, –206. *McShain* and *Capital Traction*, therefore, remain binding precedent; the Contract Clause does not limit Congress.

### IV.

### A.

■ This does not end the inquiry, however. It is necessary to address the fact that, in the Self–Government Act, Congress subjected the District government's own exercise of "legislative power" to the limitations of the Contract Clause:

> Except as provided in §§ 1–206, 1–233, and 47–313, the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act *subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.*

D.C.Code § 1–204 (emphasis added). Nonetheless, as indicated in § 1–204 itself—and reflective of our conclusion that the Contract Clause does not limit the power of Congress when acting as the District's local legislature—this statutory Contract Clause limitation is subject to congressional override. All three D.C.Code sections listed in § 1–204 as exceptions to the District's exercise of legislative power reflect ways in which Congress has reserved legislative powers over the District to itself. *See* D.C.Code §§ 1–206, 1–233 (1992 Repl.), 47–313 (1990 Repl.). For example, § 1–206 provides:

> Notwithstanding any other provision of this Act, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this Act, including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council.

Therefore, even if the District government were to violate the statutory provision requiring it to abide by the Contract Clause, *see* D.C.Code § 1–204, Congress could step in and—by invoking § 1–206 to pass the same legislation in its own right—impose on the District a statute that, if enacted by a state, would violate the Contract Clause. *Cf. Thompson, supra* note 7 (legislative power delegated to District government by Congress subject "to the power of Congress at any time to revise, alter, or revoke the authority granted"); *Mattingly, supra* note 6.

The question remains, however, whether—despite congressional immunity from the Contract Clause—the District government's own actions with respect to furloughs, within-grade increases, and accruals of time in grade under the 1993 Budget Request Act have violated § 1–204 (applying the Contract Clause to the District) in a way that entitles the unions to relief. Or, instead, as the District contends, has congressional action through the appropriations process—immune from the Contract Clause—superseded or "trumped" any Contract Clause-type limitation on the District's Budget Request Act and thus mooted any possible District violation of § 1–204?

### B.

The answer turns on a more detailed explanation of the legislative interplay between the District and Congress. With certain exceptions—most importantly the appropriations process (as elaborated below)—District legislation is routinely sub-

ject to congressional oversight permitting an "override" by joint resolution of both houses of Congress within a statutorily defined layover period. D.C.Code § 1-233(c). If, however, Congress's mere failure to "override" District legislation violating § 1-204 was construed to mean that such congressional inaction amounted to oversight sufficient to "trump" or "cure" this statutory Contract Clause violation in every case, then § 1-204 would be a nullity. We shall assume for the sake of argument, therefore, that if Congress, in exercising its required oversight, fails to "override" District legislation subject to the normal congressional layover procedure, then this court could invalidate such legislation if that legislation violated § 1-204, incorporating the Contract Clause. We need not resolve that issue here, however, because D.C.Code §§ 1-233(c) (1992 Repl.) and 47-304 altogether exclude the District's appropriations process from this legislative "override" procedure. The possibility that the § 1-204 Contract Clause limitation could survive the usual congressional oversight of District legislation does not mean that this limitation survives—or even applies—in this case.

Congress has retained the power to appropriate all District revenues. *See* D.C.Code § 47-304. The Council and the Mayor do play important roles in the process, submitting a "budget request" to the President for transmittal to Congress. *See Hessey v. D.C. Bd. of Elections & Ethics,* 601 A.2d 3, 9-11 (D.C.1991) (en banc). But the statutory procedures for adopting the District's Budget Request Acts differ from those for other legislation. This court recently summarized the stages of this process. First,

> The Mayor is required to prepare and submit to the Council an annual budget that "specif[ies] the agencies and [the] purposes for which funds are being requested; and ... shall be prepared on the assumption that [the] proposed expenditures ... for such fiscal year shall not exceed estimated resources from existing sources and proposed [re]sources." D.C.Code § 47-301(a)(1). The Mayor's annual budget must include, in addition,

> a number of reports, such as multiyear plans for operating and capital expenditures, and program performance and issues reports. *Id.* § 47-301(a)(3)-(6).

*Hessey,* 601 A.2d at 9. Another provision requires the Mayor "to prepare studies in connection with submission of the Mayor's proposal for the annual amount of the federal payment." *Id.* at 9 n. 7 (citing D.C.Code § 47-3405). Thereafter, the Council, using procedures "contained elsewhere in title IV of the Self-Government Act," *id.* at 9 n. 8 (citing D.C.Code §§ 1-227, -229), "is required to adopt by act the annual budget within 50 days of receiving the Mayor's budget proposal." *Id.* at 9 (citing D.C.Code § 47-304). Then "[t]he Mayor may disapprove 'any item or provision' of the Council's Budget Request Act, subject to override by two-thirds of the Council." *Id.* (citing D.C.Code § 1-227([f])). The result "is required to be a balanced budget, with proposed expenditures not exceeding existing and proposed revenues in the fiscal year." *Id.* (citing D.C.Code § 47-313(c)-(d)). Once the District has enacted its Budget Request Act, "the Mayor is required to support" it during the remaining stages of the process: "when the District's budget is pending before the President, under review by the office of Management and Budget, and also before Congress, after the President has submitted a budget request on behalf of the District government for approval by Congress." *Id.* (citing D.C.Code §§ 47-304, 313).

These procedures "perform the function of forcing the locally elected officials to determine how they want Congress to authorize the spending of government revenues among competing programs and activities in a fiscal year." *Id.* As a result, the District's Budget Request Act remains

> an important document beyond the District government, notwithstanding Congressional line-by-line review of the District's budget request by the Congressional Appropriations Subcommittees on the District of Columbia. The Budget Request Act sets the baseline for Congressional review, and in view of Con-

gressional commitment to self government, *see* D.C.Code § 1–201(a), the restructuring of the proposed allocation of revenues may often be substantially in accord with that proposed in the Budget Request Act.

*Id.* (footnote omitted). From this process, Congress over the years has produced D.C. Appropriations Acts based on, but not identical to, the District's requests. "Experience suggests that the Congress is likely to approve much of the District government's proposal in the Budget Request Act, while exercising the right to modify some requests and add restrictions not sought by the District government." *Id.* at 9 n. 11.

■ Accordingly, regardless of the extent of the "responsibility for the proper allocation of District government revenues" that this process assigns "to the District government's elected officials" through adoption of a Budget Request Act, *id.* at 11, every D.C. Appropriations Act remains exclusively an act of Congress. Congress subjects it to the same procedures that govern any of its other appropriations measures—a different, more active process than the mere failure to "override" reserved for the District's ordinary legislation. *See Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics,* 441 A.2d 889, 904 & n. 28 (D.C.1981) (en banc) (plurality opinion). Therefore, even if the District did violate the statutory Contract Clause limitation, D.C.Code § 1–204, by adopting the 1993 Budget Request Act—a question we need not answer here [9]—the furlough provisions, as well as those barring within-grade increases and accrual of time in grade, are now operative through the 1993 Appropriations Act, *i.e.,* through legislation enacted exclusively by Congress, which is not bound by the Contract Clause of the Constitution. *See*

*McShain,* 92 U.S.App.D.C. at 359, 205 F.2d at 883; *see also* D.C.Code §§ 1–204, –206.

### V.

■ The trial judge provided still another ground for his conclusion that the furlough, within-grade increase, and time-in-grade provisions in the 1993 Appropriations Act violated the Contract Clause: the Act's legislative history. The congressional conference report said:

The action by the Congress in approving the District government's requested furlough adjustment and within-grade salary adjustments was taken without prejudice to any party in any court proceedings, past, present or future.

The District government takes many actions with which individual members of Congress, and citizens of the District, may agree or disagree. And because of the unique, and sometimes awkward, role the Congress plays in District matters, often the Congress is called upon to ratify or to let pass various city actions. The conferees believe that this is such a matter and that it should be decided on its own merits by the local branches of government. It is the conferees' hope that matters of this type can be decided at the local level by the citizens and their government and not be viewed through the prism of congressional action or inaction.

H.R.Rep. No. 906, 102d Cong., 2d Sess. 22 (1992); 138 Cong.Rec. H9407 (daily ed. Sept. 24, 1992). The judge interpreted this passage to mean that Congress viewed the 1993 Appropriations Act as a local law, subject to the restrictions on state legislation embodied in the Contract Clause.

Although we have already shown that Congress has the power to ignore the principles of the Contract Clause when it legis-

9. The employees' unions did challenge the 1993 Budget Request Act on its way to Congress, seeking injunctive relief that theoretically could have halted transmittal of legislation violating § 1–204. The Superior Court, however, stayed the litigation for approximately a month pending congressional action on the District's budget. The unions did not attempt to appeal that stay to this court. *See generally Hagner Mgmt.*

*Corp. v. Lawson,* 534 A.2d 343 (D.C.1987). Thus, we have had no occasion to rule on the question whether a Budget Request Act itself is an exercise of legislative power, subject to the Contract Clause of the Constitution by virtue of D.C.Code § 1–204, which the local courts of this jurisdiction could strike down on its way to Congress.

lates for the District, we shall assume—solely for the sake of argument—that Congress does not necessarily have to ignore those principles when it adopts such legislation. We shall assume, without deciding, that given its plenary power over District matters, Congress could enact a law for the District that explicitly conveys an intention *not* to impair any existing contract and thereby delegates to our local courts the authority both to determine whether a particular provision does impair the obligation of contracts and to sever that provision if necessary (and if possible) to effect such congressional intent. But even if Congress could have taken this approach in its 1993 Appropriations Act for the District, we are not willing to conclude that Congress has done something so unusual without expressly referring to § 1–204 (Contract Clause) principles in the legislation itself and saying they do apply. That has not happened here.

Taking the matter a step further, let us assume we could look to the legislative history of the 1993 Appropriations Act.[10] Even so, the relevant portion of the conference report does not clearly convey a congressional intent to subject the furlough, within-grade increase, and time-in-grade provisions to the § 1–204 Contract Clause limitation. The conference report refers to approving the furlough and other challenged provisions "without prejudice to any party in any court proceedings, past, present or future." The report also expresses the "conferees' hope that matters of this type can be decided at the local level by the citizens and their government and not be viewed through the prism of congressional action or inaction." If Congress, through this language, was attempting to limit its own constitutional power, that intention is altogether lost in words of mere "hope" that what Congress is doing will be "without prejudice" to some unidentified "court proceedings." We cannot say that this vague language implies a self-imposed limi-

tation on congressional power in the 1993 D.C. Appropriations Act.

Because we conclude that Congress is not bound by the Contract Clause in legislating for the District, and because we further conclude that Congress has not clearly conveyed an intent to impose that Clause as a limitation on the 1993 Appropriations Act, we need not decide whether the furlough, within-grade increase, and time-in-grade provisions impair obligations under existing union contracts.

### VI.

The trial judge also held that the school employee unions in 92–CV–1276 have an additional basis for relief in D.C.Code § 31–104:

> With respect to the annual budget for the Board of Education in the District of Columbia, the Mayor and the Council may establish the maximum amount of funds which will be allocated to the Board, but may not specify the purposes for which such funds may be expended or the amount of such funds which may be expended for the various programs under the jurisdiction of the Board of Education.

The judge ruled "that until Section 31–104 is repealed, neither the ... Council [of the District of Columbia] [n]or the Congress by an Appropriations Act may intrude upon the Board's management of its own internal affairs." The judge further concluded that the 1993 Appropriations Act had not repealed § 31–104.

We agree that Congress did not repeal or amend § 31–104, but Congress did not need to do so in order lawfully to "intrude upon the Board's management of its own internal affairs." While § 31–104 limits the power of "the Mayor and the Council," it in no way constrains Congress. Contrary to the trial judge's interpretation of *Barry v. Bush*, 581 A.2d 308 (D.C.1990), the court in that case held only that § 31–104 prohibited unilateral budget cuts by the Mayor,

---

**10.** This is doubtful given the rule of statutory interpretation that a court generally "will not look beyond the plain meaning of a statute when the language is unambiguous and does

not produce an absurd result." *Gibson v. Johnson,* 492 A.2d 574, 577 (D.C.1985) (citing *Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc)).

acting without the Council, and that nothing in the District's 1990 Appropriations Act overrode that provision. Just as Congress has not bound itself to the Contract Clause under § 1–204, whether in appropriating revenue for the District or in enacting other local legislation, congressional authority is not limited by § 31–104.

## VII.

The unions argue, in the alternative, that Congress and the District have deprived their members of property without due process of law by imposing the furloughs and eliminating within-grade increases and accrual of time in grade under the 1993 Appropriations Act.

It is true that, although Congress is not bound by the Contract Clause or by D.C.Code §§ 1–204 or 31–104, its actions are limited by the Due Process Clause of the Fifth Amendment. As the trial judge correctly noted, *McShain* recognized the "measure of protection against contract impairment by the federal government" afforded by the Fifth Amendment. 92 U.S.App.D.C. at 360, 205 F.2d at 884 (citations omitted).

To put the matter in perspective we note, first, that the Supreme Court has announced a legal test for determining whether an act of Congress has violated due process by impairing contracts between private parties. In *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Court adopted for this purpose the language of limited judicial review from *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976):

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted *in an arbitrary and irrational way.*

*Pension Benefit Guar. Corp.*, 467 U.S. at 729, 104 S.Ct. at 2717 (citations omitted,

emphasis added). The Court rejected the argument that, when Congress impairs a contract obligation, a stricter due process standard should apply than the standard applicable to other economic legislation: "We have never held ... that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts." *Id.* at 733, 104 S.Ct. at 2719.

■ The Supreme Court has adopted a stricter standard of review, however, when Congress itself has impaired the federal government's own contracts, in contrast with impairing contracts entirely between private parties:

There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements.... To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government.

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 471 n. 24, 105 S.Ct. 1441, 1455 n. 24, 84 L.Ed.2d 432 (1985) (quoting *Perry v. United States*, 294 U.S. 330, 350–51, 55 S.Ct. 432, 434–35, 79 L.Ed. 912 (1935)). Accordingly, although Congress has wide latitude in adopting economic legislation with almost any rational purpose, it is not necessarily free to impair its own contracts. When, for example, Congress repudiated vested rights by cancelling federally-subsidized war risk insurance, the Supreme Court held that "Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the at-

tempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). *See also Nat'l R.R. Passenger Corp.,* 470 U.S. at 471 n. 24, 105 S.Ct. at 1454 n. 24; *Thorpe v. Hous. Auth. of City of Durham,* 393 U.S. 268, 279 n. 33, 89 S.Ct. 518, 524, 21 L.Ed.2d 474 (1969).

The United States is not formally a party to the collective bargaining agreements at issue here between the unions and the District. Moreover, the unions have premised their due process argument not on *Lynch* but on the Supreme Court's *Pension Benefit Guaranty Corp.* analysis: they would have us apply the "arbitrary and irrational" test that is appropriate when congressional legislation has allegedly impaired obligations of contracts to which Congress (or the federal government) itself is not a party. *See id.,* 467 U.S. at 729, 104 S.Ct. at 2717; appellees' amended brief at p. 44. For purposes of due process analysis, therefore, the unions apparently see Congress and the District not as a merged entity—Congress acting as the District— but as separate entities. The District appellants share this perception. It is not for us to frame the argument differently. For these reasons, therefore, we shall proceed on the premise the parties have proffered: that the "arbitrary and irrational" test applies.[11]

"Any party assailing the constitutionality of a statute has the heavy burden of demonstrating that it has no rational basis."

*United States v. Thorne,* 325 A.2d 764, 766 (D.C.1974) (citation omitted). In this instance, the focus must be on whether there is a rational, rather than arbitrary, basis for the furlough and other contested provisions. The inquiry, moreover, "must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support" for the congressional decision. *Id.* (quoting *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)); *accord Backman v. United States,* 516 A.2d 923, 927 (D.C.1986).

▪▪▪▪ In adopting the furlough provisions, as well as eliminating within-grade increases and accruals of time in grade, Congress was working with the District to achieve an overall equitable District budget consistent with revenues available to the District government from the federal government and from local sources. This involved judgments about how much from federal resources, as well as from local resources, could be raised and allocated to meet District needs, in contrast with national needs. It also involved judgments about how various burdens, as well as benefits, could best be allocated locally. For example, judgments presumably were made that furloughs and a moratorium on within-grade increases were fairer to government employees, taken as a whole, than alternatives such as reductions in force.

---

**11.** This premise is not free from doubt. Arguably, a proper due process analysis would characterize the District government, *i.e.,* the formally contracting party, as in reality the agent of Congress, such that the higher standard of review would apply. The District occupies a unique constitutional relationship with Congress under Article I, Section 8, Clause 17 of the Constitution. Thus, as a result of the Self-Government Act, the District is delegated a measure of what otherwise would be congressional authority. Of relevance here is the fact that the District is the initiator of, and party to, the budget and appropriations process finally legislated by Congress. *See supra* Part IV. B. Arguably, therefore, the District is not analogous to a mere private, though government-chartered cor-

poration, such as Amtrak, whose contracts with third parties, when affected by Congress, are reviewable under the "arbitrary and irrational" standard applicable when Congress allegedly impairs only private contractual rights. *See Nat'l R.R. Passenger Corp.,* 470 U.S. at 476–77, 105 S.Ct. at 1457; *Pension Benefit Guar. Corp.,* 467 U.S. at 729, 104 S.Ct. at 2717. Rather, because Congress has final authority over how much the District spends and how expenditures generally are to be allocated, Congress arguably is directly responsible for any impairment of the unions' collective bargaining agreements with the District, *see* D.C.Code §§ 1–618.16, – 618.17, as though Congress itself were a party to those agreements.

These judgments incorporate rational decision-making that this court shall not second-guess. There is no violation of the unions' due process rights here.

## VIII.

We reverse the trial court's orders granting preliminary injunctions against the District appellants. We remand to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*